UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORTHWEST BORING COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> ADMIRAL INSURANCE COMPANY, <br><br> Defendant. | CASE NO. C24-1310 MJP <br><br> ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 28-1) and Defendant's Motion for Summary Judgment (Dkt. No. 29). Having reviewed the Motions, the Oppositions (Dkt. Nos. 32 & 35), the Replies (Dkt. Nos. 33 & 39), and all supporting materials, the Court DENIES both Motions.

**BACKGROUND**

Plaintiff Northwest Boring Company (NWB) asserts that Defendant Admiral Insurance Company (Admiral) failed to defend it against claims arising out of NWB's microtunneling work on a water quality project in Seattle. NWB pursues breach of contract and extracontractual

claims against Admiral. Admiral admits that there is coverage and that it would have defended against the claims made against NWB, but contends that it cannot face liability because NWB failed to timely tender the counterclaim giving rise to NWB's liability and violated its contractual duty to cooperate with Admiral. To unpack these arguments, the Court reviews the timeline of events and the communication between the Parties.

**A.    NWB's Microtunneling Work**

NWB was hired by Lane Construction Co. as a subcontractor for the City of Seattle's Ship Canal Water Quality Project. (Second Amended Complaint ¶ 5 (Dkt. No. 19).) Starting in 2021, NWB performed microtunneling for the project and experienced two setbacks. (Deposition of Dennis Molvik at 7 (Ex. B to the Declaration of Jared Kiess) (Dkt. No. 31-2).) First, in September 2021, a joint on a pipe NWB installed burst and caused a catastrophic failure that delayed NWB's work until November 2022. (Id. at 8-10.) Second, on December 8, 2022, a sinkhole was found near NWB's tunneling site, causing the worksite to close after the City issued a stop-work order. (Id. at 11, 21-24; Kiess Decl. Exs. E-G (Dkt. Nos. 31-5, 31-6, 31-7) (City stop work orders and Lane's notice of holding NWB responsible).) Lane blamed NWB for the costs incurred in filling the sinkhole and for the delay. (Kiess Decl. Exs. E-G.)

The December 8th sinkhole is the only incident relevant to the present dispute, primarily because Admiral's commercial general policy was only in force between June 1, 2022 to June 1, 2023. (SAC ¶ 6.)

**B.    NWB Informs Admiral of the December 2022 Sinkhole**

Immediately after the December 8th sinkhole was discovered, Lane gave notice to NWB that it would "be held responsible for all additional cost and schedule impact caused by this event if it is determined to be NWB's fault." (Molvik Decl. Ex. C (Dkt. No. 28-5).) Eleven days later,

1  NWB's insurance broker contacted Admiral to notify it of the "12/8/22 sinkhole discovered at
2  Fremont, WA jobsite" and to ask Admiral to "Please open new potential claim and contact
3  insured, per below preliminary information." (Ex. B to the Declaration of Ruth Cutuli (Dkt. No.
4  30-2).) That same day (December 20, 2022), Admiral retained a third-party adjuster, McLarens,
5  to investigate the claim, and an individual named Crockett Blanchard promptly contacted NWB
6  to discuss. (Cutuli Decl. Exs. C & D (Dkt. No. 30-3, 30-4).) Blanchard prepared a preliminary
7  report dated January 6, 2023, which indicated that "[t]here are currently no damages claimed by
8  any party" and that there had been no tender. (Cutuli Decl. Ex. E (Dkt. No. 30-5).) NWB paid
9  Blanchard for his work, as this was part of the deductible. (Molvik Decl. Ex. D (Dkt. No. 28-6).)
10  And on January 10, 2023, Admiral directed McLarens to close the file "[a]s no claim is being
11  presented[.]" (Hayes Decl. Ex. C at 9-10.) Admiral did not inform NWB that it closed the file.

12  **C.    Lane and NWB Dispute Impacts Related to December 8th Sinkhole Event**

13         In early 2023, Lane informed NWB that it expected about $20,000 to $25,000 in costs
14  associated with the sinkhole. (Kiess Decl. Ex. K (Dkt. No. 31-1).) This sum increased as Lane
15  issued "Change Order 04," which identified a variety of costs it claimed to have incurred as a
16  result of the December 2022 sinkhole for which it blamed NWB. (Molvik Decl. Ex. E (Dkt. Nos.
17  28-7).) NWB did not necessarily dispute liability for the delay and costs associated with the
18  December 8th sinkhole, but it demanded that Lane provide it with a change order so that it could
19  pursue an incentive payment from the City. (Kiess Decl. Ex. O (Dkt. No. 31-15).) Lane did not
20  comply with NWB's request.

21         In August 2023, NWB decided to file suit against Lane in an effort to obtain
22  approximately $3.1 million that Lane had withheld from NWB, though these funds were not
23  linked exclusively to the December 2022 sinkhole (aka Change Order 04). (Kiess Decl. Ex. Q
24

1  (Dkt. No. 31-17).) The allegations against Lane were made in existing litigation between NWB
2  and the pipe manufacturer whose joint failed in 2021. Rather than file a separate suit against
3  Lane, NWB added Lane as a party to its Third Amended Complaint. (Kiess Decl. Ex. Q (Dkt.
4  No. 31-17).)
5        In response to NWB's claim, Lane filed a counterclaim against NWB on September 7,
6  2023. (Molvik Decl. Ex. F (Dkt. No. 28-8).) In the counterclaim, Lane alleged that NWB
7  breached the construction agreement by installing the pipe which failed and caused damage. (Id.
8  at 17.) Lane identified Change Order 04, which was specific to the December 2022 sinkhole, as
9  one of several change orders that it "incurred due to NWB['s] . . . failure to perform" according
10 to the construction agreement. (Id.) And it claimed over $4 million in additional costs it incurred
11 as a result. (Id.)
12 **D.    NWB Provides Admiral Late Notice of its Dispute with Lane**
13       Until April 2024, NWB did not apparently reach out to Admiral to discuss the December
14 8th sinkhole or the counterclaim filed against it, and Admiral similarly did not reach out to NWB
15 to follow up on the sinkhole. Admiral's claim file shows no entries between January 2023 and
16 April 8, 2024. (Hayes Decl. Ex. C at 9 (Dkt. No. 27-3).) On April, 2024, Admiral received
17 "[r]eport from government" and reopened the claim. (Id.) The claim file also shows Admiral
18 reopened the claim in April 2024 after it reviewed "communications from the insured as they
19 relate to this claim previously tendered regarding a sinkhole" and that other information from
20 Lane "may indicate an ongoing loss[.]" (Hayes Decl. Ex. C at 10 (Dkt. No. 27-3).) This is
21 consistent with other documents in the record showing that in April 2024, Admiral reopened the
22 claim for the December 8, 2022 sinkhole after NWB notified its broker that Lane was making
23 new monetary demands related to a new sinkhole at or near the same site. (See Cutuli Decl. Ex.
24

G (Dkt. No. 30-7).) McLarens also reopened its file and continued to work with NWB through the process of assessing the new sinkhole. (See Cutuli Decl. Exs. G & H (Dkt. Nos. 30-7 & 30-8).)

On April 12, 2024, NWB's Molvik reached out to both McLarens and Admiral to notify them that NWB was still awaiting Admiral's coverage determination on the December 2022 sinkhole. (Kiess Decl. Ex. R (Dkt. No. 31-18).) Molvik invited Admiral to participate in the April 23, 2024 mediation, where NWB and Lane were "mediat[ing] the claims between them—including the sinkhole claim[.]" (Id.) Molvik did not identify that the claims were in litigation or forward on a copy of Lane's counterclaim. Nor did NWB ask for any defense to the counterclaim. Blanchard from McLarens responded to Molvik and asked for "the contract agreement that pertains to Lane Construction" and "any other documents or information related to the Fremont, WA [sic] project." (Kiess Decl. Ex. T (Dkt. No. 31-19).) On April 22, 2024, counsel for NWB from Ahlers Cressman & Sleight PLLC also invited Admiral to participate in the mediation with Lane set for the following day. (Cutuli Decl. Ex. I (Dkt. No. 30-9).) The email referenced the December 8th sinkhole, but did not indicate that there was active litigation between NWB and Lane (or any other party). Admiral participated in the mediation, but was not requested to make any payment. NWB did not identify the lawsuit at any point during the mediation. And Blanchard from McLarens asked NWB's attorney from Ahlers to provide "any information and knowledge in regard to our representation as it may pertain to the claim." (Cutuli Decl. Ex. J (Dkt. No. 30-10).) During the April 23rd mediation, Admiral received no settlement demands and was not asked to contribute to any settlement offers. (Cutuli Decl. ¶ 15.)

### E. NWB Sues Admiral

In August 2024, NWB's attorneys at Harper Hayes PLLC (who represent NWB in this lawsuit) sent the Washington Insurance Commissioner and Admiral a notice consistent with the Insurance Fair Conduct Act that Admiral had unreasonably denied a claim for coverage and failed to defend NWB. (Cutuli Decl. Ex. K (Dkt. No. 30-11).) NWB filed this lawsuit on August 21, 2024. (Compl. (Dkt. No 1).) According to NWB, Admiral had not taken a position on whether there was coverage for the December 8th sinkhole event or whether Admiral had a duty to defend. (Molvik Decl. ¶ 13.) But apparently it was not until September 4, 2024 that NWB (through counsel at Harper Hayes) sent Admiral a copy of Lane's counterclaim, which Admiral insists it never received before that date. (Cutuli Decl. Ex. J (Dkt. No 30-12).) And NWB's counsel at Harper Hayes confirmed that he did not have documentation showing NWB sent a copy of Lane's counterclaim to Admiral. (Id.) Admiral's primary adjuster also avers that "[i]f Admiral had been provided with a copy of Lane's demand letters, Admiral would have paid them." (Cutuli Decl. ¶ 16.) She also avers that had Admiral been asked, it would have provided a defense to the counterclaims Lane asserted against NWB. (Id.)

NWB and Lane settled their claims against one another on October 8, 2024. (Molvik Decl. ¶ 14.) NWB incurred over $300,000 in unreimbursed legal and expert fees, though another insurer did pay some of NWB's defenses costs. (Id. ¶¶ 14-15.) NWB then filed this suit, pursuing breach of contract, bad faith, IFCA, and CPA claims. (SAC.)

## ANALYSIS

### A. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(1). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323-24.

**B.      Duty to Defend and Duty to Cooperate**

Both parties have cross-moved for summary judgment on NWB's breach of the duty to defend claim. Additionally, Admiral seeks summary judgment on its affirmative defense that NWB breached the cooperation clause in the insuring agreement. Given the disputes of fact material to the claim and defense, the Court DENIES both Motions on the claim and defense.

"Washington courts have said that an insurer's duty to defend 'arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage.'" Mut. of Enumclaw Ins. Co. v. USF Ins. Co., 164 Wn.2d 411, 420–21 (2008) (quoting Unigard Ins. Co. v. Leven, 97 Wn. App. 417, 425 (1999), as amended (Apr. 24, 2000)). "However, '[A]n insurer cannot be expected to anticipate when or if an insured will make a claim for coverage; the insured must affirmatively inform the insurer that its participation is desired.'" Id. at 421 (quoting Grifin v. Allstate Ins. Co., 108 Wn. App. 133, 140 (2001) (alteration in original) (quotation and citation omitted)). "Thus, 'breach of the duty to

defend cannot occur before tender.'" Id. (quoting Grifin, 108 Wn. App. at 141). In other words, "[t]he duties to defend and indemnify do not become legal obligations until a claim for defense or indemnity is tendered." Id. This recognizes the concept of selective tender—where "[a]n insured may choose not to tender a claim to its insurer for a variety of reasons," including, for example, avoiding premium increases. USF, 164 Wn.2d at 422.

The record before the Court evidences disputes of material fact as to when NWB tendered its defense to Admiral. Although the Court finds no evidence to support NWB's theory it tendered the claim in 2022, the Court finds that NWB tendered by September 2024 and potentially as early as April 2024. The Court reviews the evidence before it and the evidence concerning Admiral's affirmative defense.

NWB unconvincingly argues that it tendered the claim back in December 2022, when it let Admiral know about the damage from the sinkhole. But there were no claims for indemnity or defense at that time, as there were no damages identified and no threat of a lawsuit. Even if Admiral had some notice that there had been a sinkhole and potential damage associated with NWB's work, Washington law requires the insured to "affirmatively inform the insurer that its participation is desired"—that is, "specifically ask[] the insurer to undertake the defense of the action." Leven, 97 Wn. App. at 427. Aside from asking its broker to file a claim and working with McLarens, NWB did not indicate to Admiral that it sought assistance for indemnity or defense. The record here lacks sufficient evidence of a tender from December 8, 2022 to April 2024, when NWB provided some indication that claims might exist (as explained in the following paragraph). NWB argues that by notifying Admiral in 2022, it sufficiently triggered Admiral's duty to defend the counterclaim even though it was not filed until September 2023 and NWB did not provide notice of the counterclaim until 2024. In support of this argument, NWB

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 8

1  invokes <u>Dolsen Companies v. Bedivere Ins. Co.</u>, where the Court explained that "a tender for
2  one benefit under a policy is effective as to any pertinent coverage under the policy." No. 1:16-
3  CV-3141-TOR, 2018 WL 3603059, at *3 (E.D. Wash. May 16, 2018). But <u>Dolsen</u> remains
4  factually distinct and of no aid to NWB. In <u>Dolsen</u>, the insured "tendered their request for
5  defense and indemnity, which Defendants denied based" on an exclusion the Court found to bar
6  coverage. <u>Id.</u>, at *1. But through discovery, the insured learned of a new claim for coverage for
7  first-party coverage that the insurer had failed to disclose, and amended its suit. <u>Id.</u> The Court
8  found that the first tender was effective as to the newly-revealed claims "because the request for
9  benefits triggers the insurer's duty to not only consider the specific benefits requested, but also
10 the duty to disclose pertinent coverage to the insured." <u>Id.</u>, at *3. But here, the facts do not align
11 in any meaningful way. Unlike the plaintiff in <u>Dolsen</u>, NWB did not ask for Admiral to defend it
12 in 2022 when it filed the claim—it just asked that the claim be opened. This put Admiral on
13 notice only that the insured might ask for indemnity, but not a defense. Second, unlike the
14 insurer in <u>Dolsen</u> who withheld information that excused the tender, Admiral is not alleged to
15 have withheld information. Instead, NWB withheld information about Lane's counterclaim from
16 Admiral. The facts here do not suggest that NWB's filing of the claim for potential indemnity
17 was sufficient to constitute a tender for defense of the counterclaim.

18       But material facts are in dispute as to whether NWB tendered a request for defense from
19 Lane's counterclaim in April 2024 when it invited Admiral to participate in the mediation. True,
20 neither NWB nor its outside counsel directly asked Admiral to defend it against the counterclaim
21 or even provided notice that there were such a claim. But there are no magic words necessary to
22 constitute a tender of a defense. See <u>Osborne Constr. Co. v. Zurich Am. Ins. Co.</u>, 356 F. Supp. 3d
23 1085, 1094 (W.D. Wash. 2018) (noting that "no particular set of magic words . . . are

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 9

1  necessary to invoke an insurer's duty to defend"). A jury might agree with NWB that by inviting
2  Admiral's participation in the mediation on an issue involving a previously-filed claim for which
3  NWB paid its deductible, it tendered the request for defense. Evidence in the record supports this
4  position. Notably, Admiral's claim file shows that it reopened the claim in April 2024 after it
5  reviewed "communications from the insured as they relate to this claim previously tendered
6  regarding a sinkhole" and that other information from Lane "may indicate an ongoing loss[.]"
7  (Hayes Decl. Ex. C at 10 (Dkt. No. 27-3).) But construing the facts in the light most favorable to
8  Admiral, the Court finds it equally possible that a jury would find no tender because NWB did
9  not identify the counterclaim and made no specific request for a defense. Given that both parties
10 move for relief on this claim, the Court finds that material facts preclude summary judgment. A
11 jury must resolve whether the April 2024 events constitute a tender.

12      NWB also points to undisputed evidence that it tendered its defense by September 2024,
13 when it provided a copy of the counterclaim. On this point, there are no disputed facts. Although
14 the tender occurred after this lawsuit was filed, the underlying dispute between Lane and NWB
15 was not settled until October 2024. And there is no evidence that Admiral undertook any defense
16 after September 2024. As such, the Court finds that NWB possesses a valid claim for breach of
17 the duty to defend given this valid tender in September 2024. But, as explained in the following
18 paragraphs, NWB is not entitled to summary judgment because Admiral has identified disputed
19 material facts that support its affirmative defense that NWB breached the cooperation clause by
20 waiting too long between the filing of the counterclaim and the September 2024 tender.

21      Under Washington law, "[t]ypically, an insured that 'substantially and materially'
22 breaches a cooperation clause is contractually barred from bringing suit under the policy if the
23 insurer can show it has been actually prejudiced." Staples v. Allstate Ins. Co., 176 Wn.2d 404,
24

410. The burden of proving noncooperation is on the insurer. Oregon Auto. Ins. Co. v. Salzberg, 85 Wn.2d 372 (1975). To prevail on this affirmative defense, an insurer must show three things: (1) the insured failed to "substantially comply" with the terms of the cooperation clause; (2) the information at issue was material to the circumstances giving rise to the insurer's liability, (3) the insurer suffered actual prejudiced as a result. See Staples, 176 Wn.2d at 410.

Disputed material facts preclude summary judgment on Admiral's defense that NWB failed to substantially comply with the policy's cooperation provision. That contractual provision required NWB to "[n]otify [Admiral] as soon as practicable" of any lawsuit brought against it, and provide copies of all related legal papers. (Cutuli Decl. Ex. A at 20).) Here, NWB failed to promptly notify Admiral of the counterclaim, which was material to Admiral's liability. The facts here would thus support the first two claim elements. And if the only tender is found to be September 2024, then Admiral possesses a strong defense, particularly since the lawsuit was filed a month before the tender. But as to the final element—actual prejudice—there remains a dispute of material fact. Admiral claims it was prejudiced in helping to defend NWB and that the Court here can presume prejudice given the outcome in Felice v. St. Paul Fire & Marine Ins. Co., 42 Wn. App. 352 (1985), where a six month delay was found sufficient. But as the Washington Supreme Court has noted, "prejudice is an issue of fact and will seldom be established as a matter of law." Dien Tran v. State Farm Fire & Cas. Co., 136 Wn.2d 214, 228 (1998). Claims of actual prejudice require "affirmative proof of an advantage lost or disadvantage suffered as a result of the [breach], which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to coverage or liability." Id. The Court has not been provided with convincing and undisputed evidence of actual prejudice, particularly given the disputes of fact as to the timing of the tender. Moreover, the facts here stray from those in Felice, where the

insured ask for a defense only after he lost at trial and after the appeal period ran. Construing the facts in NWB's favor, NWB notified Admiral by either April or September 2024, before any resolution of the claims had been reached, and there was still time to limit at least some of the claimed damages, expert costs, and litigation expenses. Whether there is prejudice must be resolved at trial.

In summary, the Court DENIES summary judgment on the breach of the duty to defend and cooperation clause affirmative defense given the disputed material facts.

C.   **Bad Faith Claim Not Ripe for Summary Judgment**

NWB argues in its Motion that Admiral breached its duty to conduct a reasonable investigation and that it therefore owes a duty to defend by estoppel. In support of this argument, NWB cites Coventry Assocs. v. Am. States Ins. Co., a case holding that "an insured may maintain an action against its insurer for bad faith investigation of the insured's claim and violation of the CPA regardless of whether the insurer was ultimately correct in determining coverage did not exist." 136 Wn.2d 269, 279 (1998). But Coventry does not quite align. In Coventry, the insurer denied coverage after performing a cursory investigation of the property damage, considering only a portion of the relevant policy, and without considering whether there were other covered losses. Id. at 274. Here, however, there was never a denial of coverage, and the facts show that Admiral did conduct an investigation into the sinkhole. While Admiral did not tell NWB that it closed the file in early 2023, it was also never asked to follow up on the initial claim. While NWB may be able to convince a jury that Admiral should have continued to investigate the claim until at least the point Lane filed a counterclaim, it would be improper to construe the facts in NWB's favor on summary judgment, particularly when there are

countervailing facts suggesting that Admiral's investigation was substantial and prompt. The Court therefore DENIES NWB's motion on this claim.

**D.     Extracontractual Claims**

The Court rejects Admiral's Motion as to NWB's extracontractual claims. First, as to NWB's bad faith claim, Admiral argues a jury could not find it liable for denying a claim that was never tendered. (Def. Mot. at 16.) But given the dispute of fact as to the timing of tender and the cooperative clause affirmative defense, this argument cannot be resolved at summary judgment. Second, as to the IFCA claim, Admiral argues that it cannot be liable because it did not unreasonably deny coverage. But if it unreasonably failed to defend, then the claim may still proceed, and resolution of it turns on the disputed facts concerning tender and breach of the cooperation clause. Third, Admiral's requested dismissal of the CPA claim must be rejected at summary judgment because it, too, is bound up in the same web of disputed facts concerning the nature and timing of the tender.

## CONCLUSION

Material facts exist in the record presented to the Court that prevent summary judgment on any of claims and defenses identified by the Parties in their cross-motions. A jury will need to hear and weigh the evidence concerning the tender of the claims and the relevant facts concerning Admiral's cooperation clause defense. Accordingly, the Court DENIES both Motions, and the matter will be need to be resolved at trial.

The clerk is ordered to provide copies of this order to all counsel.

Dated October 21, 2025.

Marsha J. Pechman
United States Senior District Judge